UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EARNEST MCMILLER,

        Plaintiff,

   v.                                                 Case No. 17-C-1401

SHARON MOERCHEN and
CINDY BARTER,

        Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On October 13, 2017, *pro se* Plaintiff Earnest McMiller, who is an inmate currently housed at Kenosha Correctional Center, filed this action under 42 U.S.C. § 1983, alleging that Defendants Sharon Moerchen and Cindy Barter were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. On March 28, 2018, the court adopted the Report and Recommendation of the Magistrate Judge and allowed McMiller to proceed on his deliberate indifference claims against Defendants. Currently before the court is Defendants' motion for summary judgment. ECF No. 17. For the reasons that follow, Defendants' motion will be granted and the case will be dismissed.

## BACKGROUND

Because McMiller did not respond to the motion for summary judgment, Defendants' proposed findings of fact (ECF No. 19) are deemed admitted for the purposes of summary judgment. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); Civil L.R. 56(b)(4) ("The Court will deem uncontroverted

statements of material fact admitted solely for the purpose of deciding summary judgment.").

McMiller has been serving his state sentence since July of 2015. Sometime prior to that date, McMiller suffered gunshot wounds to both of his legs. After an initial health intake screening at Dodge Correctional Institution, McMiller was given a physical l activity classification of 02, allowing him to work at his own pace and restricting him from work assignments that require steady paced activity. It was noted in his assessment that he could not put much pressure on his left leg.

McMiller arrived at Redgranite, where Defendants Sharon Moerchen and Cindy Barter worked as Nurse Clinicians, on January 20, 2016. Over the fourteen-month period between January 20, 2016, and March 23, 2017, McMiller submitted ten Health Services Requests (HSRs) related to medical services. Two of the ten were non-emergency requests for TED hoses (compression socks), one was regarding a lump on his chin, and seven were concerning pain in his legs stemming from his gunshot injury.

Moerchen left Redgranite on June 27, 2016. During her time at Redgranite, Moerchen never treated McMiller for any complaints of leg pain nor did she triage any of McMiller's health services requests related to the pain or infection in his leg.

Barter first saw McMiller on June 9, 2016 for a follow-up appointment to McMiller's April 29, 2016 appointment where he was seen for care for his leg wounds. At this initial appointment, the nurse cleaned McMiller's wounds, saw no signs of infections, and ordered Naproxen for his pain. At the follow-up appointment, Barter assessed McMiller's leg and wound and noted that he was not in any acute distress, that he was lifting weights and walking for long distances, and that she did not see any issues with his leg and wound. McMiller also requested that his physical classification be upgraded so that he could obtain a job in the institution. In response to McMiller's request, Barter scheduled an

appointment with an Advanced Care Provider (ACP) to assess his classification as only an ACP can change a medical classification.

Barter did not see McMiller again until mid-October. In the meantime, Dr. Sauvey changed McMiller's physical activity level to 04 on September 27, 2016, allowing him to perform any activity. In response to a HSR, Barter saw McMiller on October 18, 2016. At this assessment McMiller requested gel inserts for his shoes and informed Barter that the inside heels of his shoes had worn out. Barter provided McMiller with a special needs form and instructed McMiller to go to the laundry sergeant to request new shoes. Barter also told McMiller to discuss the gel inserts with the doctor at his next appointment.

Barter next saw McMiller on December 15, 2016, regarding a lump in his chin. Barter noted that McMiller denied a fever or chills and instructed him to write the Health Services Unit (HSU) if the lump became painful and to follow-up about it at his next appointment. They did not discuss nor did McMiller raise any issues regarding his leg at this appointment.

On December 28, 2016, Dr. Sauvey, who saw McMiller in response to an HSR, sent him to the Bellin Emergency Room (ER) to determine whether he had a blood clot in his leg where he was treated by Dr. Shattuck. Dr. Shattuck noted the scar and swelling on McMiller's left leg, that McMiller's sedimentation rate and C-reactive protein were elevated (which are considered non-specific inflammatory markers), and saw significant soft tissue swelling over McMiller's mid tibia in an x-ray. Dr. Shattuck determined that McMiller's symptoms were consistent with cellulitis, an infection in the soft tissues under the skin. McMiller was seen by a Nurse and Nurse Practitioner upon his return to Redgranite as a follow-up to his ER visit.

On December 31, 2016, Barter saw McMiller for another follow-up appointment. She took his vitals and assessed him. McMiller stated he had pain and swelling in his leg and that not much had changed. He was not in any current distress, however, and Barter noted that he had started antibiotics only three days earlier. McMiller was seen by nurses on January 2, 3, and 4 of 2017 for continued complaints of swelling in his leg and subsequent follow-ups.

On January 5, 2017, Barter saw McMiller to address his puffy lips and possible allergic reaction to antibiotics. McMiller stated that nursing staff had told him to stop taking his prescribed antibiotic due to the potential for a reaction to the medicine. Barter administered a dose of prednisone and diphenhydramine (Benadryl) to McMiller as ordered by a Nurse Practitioner. Barter also noted "will see" in his file, indicating that McMiller would later be seen by an ACP, which he did later that day. This was the last time that Barter treated McMiller in relation to his leg. The ACP who saw McMiller later that day assessed him with angioedema on his face, stopped his current antibiotic, and prescribed a different antibiotic to complete his course of treatment for cellulitis.

On January 12, 2017, Dr. Tannan followed up with McMiller regarding his evaluation at the Berlin Emergency Room for cellulitis. Given McMiller's chronic bony swelling, his prior gunshot wound, and elevated sedimentation rate, Dr. Tannan ordered an x-ray to rule out osteomyelitis. The x-ray showed that there was no radiographic evidence of osteomyelitis at that time and appeared to show overall improvement because there was more callus (new bone) formation present on McMiller's bone compared to an x-ray conducted one year prior.

In March of 2017, after continued complaints regarding his lower leg wound, McMiller was sent to the University of Wisconsin Hospital where he was diagnosed with Methicillin Resistant Staphylococcus Aureus tibial osteomyelitis. Whereas cellulitis is a skin infection, osteomyelitis is an

4

infection of the bone. Symptoms include swelling, elevated sedimentation rate and/or C-reactive protein, and bone pain. McMiller received treatment at the hospital which included removal of infected tissue and hardware in his leg, thorough irrigation and mechanical cleansing of the wound, and insertion of antibiotic laden cement in the bone. McMiller continues to take antibiotics to suppress and prevent a future osteomyelitis infection.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

McMiller argues that Moerchen and Barter were deliberately indifferent towards his medical needs. A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial

risk of serious harm violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). An inmate's claim for deliberate indifference must satisfy the following two elements, the first objective and the second subjective: "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.1998)). To establish deliberate indifference, a plaintiff must meet what is "essentially a criminal recklessness standard, that is, ignoring a known risk." *Id*. "Even gross negligence is insufficient" to impose constitutional liability. *Id*. "Even objectively serious injuries suffered by prisoners, without the requisite *mens rea* on the part of prison officials, will not comprise a constitutional injury." *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005).

"For a defendant to be liable under § 1983, he or she must have participated directly in the constitutional violation." *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). "'Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.'" *Id*. (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996)).

Regarding Moerchen, the facts reveal no connection between her and the treatment McMiller received at Redgranite. Moerchen left Redgranite on June 27, 2016. Between the time McMiller arrived at Redgranite and Moerchen departed, McMiller was seen only twice for treatment regarding

6

his leg and the undisputed evidence establishes that Moerchen was not involved either time and that she had no involvement in treatment of his leg injury in any other form. Because a defendant may be personally liable only "if the conduct causing the constitutional deprivation occurs at [her] discretion or with [her] knowledge and consent," *id.*, McMiller's claim against Moerchen is dismissed.

As to McMiller's claim against Barter, there is no evidence that she had the requisite subjective intent necessary to establish deliberate indifference. McMiller's claim appears to be that either Barter was aware but ignored the risk posed by his leg injury or failed to appropriately diagnose the cause of his symptoms as osteomyelitis. The record fails to show that Barter deliberately ignored a known risk, but instead demonstrates that Barter treated and addressed McMiller's concerns at his appointments with her, not all of which were specifically related to his leg. The record also fails to establish that Barter was involved in the failure to diagnose McMiller's tibial osteomyelitis. As a nurse clinician, she was in no position to do so. Barter was not involved in the analysis of x-rays or in making any sort of diagnosis.

For a correctional officer or health services staff to be deliberately indifferent, "[t]he official must know there is a risk and consciously disregard it. It is not enough that he 'should have known' of the risk; the standard is not the same as it would be for a medical malpractice claim." *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999). In addition, while the initial diagnosis of cellulitis was incorrect, "[t]he symptoms of cellulitis and osteomyelitis can be similar and osteomyelitis can sometimes be misdiagnosed as cellulitis," Dr. Tannan Decl. at ¶ 13, ECF No. 22, and the x-rays taken in January of 2017—after the last time Barter treated McMiller—showed no signs of osteomyelitis. Furthermore, even if Barter was involved in McMiller's misdiagnosis, "medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference."

*Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Because there is no evidence that Barter ignored a known risk, McMiller's claim against Barter must also be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 17) is **GRANTED**. The Clerk is directed to enter judgment dismissing the case with prejudice.

**SO ORDERED** this  12th  day of November, 2018.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court
